## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

No. 5:13-CV-80-D

| | |
|---|---|
| JACQUELINE DELOISE MCNEILL, | ) |
| | ) |
| Plaintiff/Claimant, | ) |
| | ) |
| | ) **MEMORANDUM AND** |
| v. | ) **RECOMMENDATION** |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE-18, DE-21] pursuant to Fed. R. Civ. P. 12(c). Claimant Jacqueline Deloise McNeill ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g), seeking judicial review of the denial of her application for a period of disability and Disability Insurance Benefits ("DIB"). The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, it is recommended that Claimant's Motion for Judgment on the Pleadings be denied, Defendant's Motion for Judgment on the Pleadings be granted, and the final decision of the Commissioner be upheld.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability and DIB on June 15, 2010, alleging disability beginning February 3, 2010. (R. 14; 156-59). Her claim was denied initially and upon reconsideration. (R. 14; 103-11; 114-17). A hearing before the Administrative Law Judge ("ALJ") was held on June 14, 2012, at which Claimant was represented by counsel and a vocational

expert ("VE") appeared and testified. (R. 32-66). On August 2, 2012, the ALJ issued a decision denying Claimant's request for benefits. (R. 11-31). On December 4, 2012, the Appeals Council denied Claimant's request for review. (R. 1-5). Claimant then filed a complaint in this court seeking review of the now final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq*., is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

2

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth

in 20 C.F.R. § 404.1520 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 474 n.2 (4th Cir. 1999). "If an applicant's claim fails

at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65

F.3d 1200, 1203 (4th Cir. 1995). The burden of proof and production during the first four steps of

the inquiry rests on the claimant. *Id*. At the fifth step, the burden shifts to the ALJ to show that other

work exists in the national economy which the claimant can perform. *Id*.

When assessing the severity of mental impairments, the ALJ must do so in accordance with

the "special technique" described in 20 C.F.R. § 404.1520a(b)-(c). This regulatory scheme identifies

four broad functional areas in which the ALJ rates the degree of functional limitation resulting from

a claimant's mental impairment(s): activities of daily living; social functioning; concentration,

persistence or pace; and episodes of decompensation. *Id*. § 404.1520a(c)(3). The ALJ is required

to incorporate into his written decision pertinent findings and conclusions based on the "special

technique." *Id*. § 404.1520a(e)(3).

In this case, Claimant alleges the following errors by the ALJ: (1) improper assessment of

Claimant's residual functional capacity ("RFC"), Pl.'s Mem. Supp. Pl.'s Mot. J. Pleadings ("Pl.'s

Mem.") at [DE-19] 13-17; and (2) failure to give proper weight to the medical opinions of two of

Claimant's treating physicians, Pl.'s Mem. at 17-21.

3

## IV. FACTUAL HISTORY

### A.    ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found that Claimant was no longer engaged in substantial gainful employment. (R. 16). Next, the ALJ determined that Claimant had the following severe impairments: degenerative disc disease of the lumbar and cervical spine, tendinitis in the left knee, obesity, asthma, chronic rhinosinusitis, depression, and cognitive disorder. *Id.* The ALJ also found Claimant to have the following nonsevere impairments: diabetes, hypertension, and moderate bilateral hearing loss. (R. 16-17). However, at step three, the ALJ concluded that these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17). Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in moderate limitations in her activities of daily living and concentration, persistence and pace, mild difficulties in social functioning, and no episodes of decompensation which were of extended duration. (R. 17-18).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform light work[1] requiring that

"[Claimant] can never climb ladders, ropes, and scaffolds; and occasionally perform all other postural activities. She cannot perform work that requires fine hearing or

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten (10) pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

4

frequent verbal communicative skills, but conversational hearing is adequate. [Claimant] must avoid concentrated exposure to hazards, pulmonary irritants, and loud noises. She is limited to performing simple, routine, and repetitive tasks, with no high-output or quota work and only occasional public contact.

(R. 18). In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 18-24).

At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of her past relevant work as a housekeeper and warehouse worker. (R. 25). Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 25-26).

## B.    Claimant's Testimony at the Administrative Hearing

At the time of the administrative hearing, Claimant was 50 years old and unemployed. (R. 25; 37). Claimant testified that she attained an 11th grade education. (R. 37). *But see* (R. 179 (Claimant states that the highest grade of school completed is the 12th grade)). Claimant was last employed in 2011 with State Employee's Credit Union for approximately two (2) months, where her duties included cleaning. (R. 55-56). Claimant's past work experience also includes jobs as a housekeeper, which she performed for approximately ten years, and as a warehouse custodian. (R. 37; 180). Claimant testified that her medical conditions forced her to leave her last two jobs because she was physically unable to perform them. (R. 37; 56).

Claimant explained numerous medical conditions which support her disability claim and her inability to work full-time. These medical conditions include back pain, left hip and leg pain, diabetes, hypertension, kidney failure, asthma, and obesity. (R. 37-39).

5

Claimant testified that she is unable to work due to pain in her back, left leg and neck. She describes her pain as regularly a ten (10) on a "1 to 10" pain scale. (R. 39). Claimant stated that the pain is sharp, that it radiates down her left leg, and that moving around too much exacerbates the pain she experiences. (R. 48). The pain prevents Claimant from doing any bending, stooping, twisting, reaching, or squatting, and makes lifting anything that weighs as much as a gallon of milk painful. (R. 41; 49-50). Claimant takes a number of medications to combat her ailments but she stated that they do not really alleviate her pain. (R. 40). Claimant also testified about a lateral meniscus tear in her left knee. She experiences pain, swelling, and stiffness and also some problems with stability and balance as a result of the tear. (R. 45). Claimant is forced to walk with a cane because of the injury and the problem has gotten worse over time. *Id.* Claimant must elevate her leg for about five hours each day to alleviate the pain. (R. 46). Claimant must walk very slowly because of her leg ailment, cannot go up or down stairs, and experiences extreme pain after walking for as little as five (5) to ten (10) minutes. *Id.* Doctors have recommended surgery to Claimant but she has not pursued that option because she cannot afford it and her insurance was canceled. (R. 45-46). Claimant also has degenerative disc disease in her neck, which causes sharp pain. (R. 53-54).

Claimant also testified to problems with asthma. This condition causes Claimant to experience attacks when in the presence of scented liquids, such as cologne or cleansers, or when lifting items at work. (R. 44; 53). Claimant's asthma is exacerbated by changes in the weather, extreme heat or cold, or humidity. (R. 39; 52-53). Claimant can walk about a block before becoming short of breath. (R. 52). The disease has also caused extra strain on her vocal cords, making speaking throughout the day more difficult. (R. 52). To combat her problems with asthma, Claimant uses three different types of inhalers every morning, two different types of pills, and

6

sometimes a nebulizer at night or early in the morning, as the need arises. (R. 52-53).

Claimant also experiences significant hearing loss because of aural polyps. Doctors have recommended that Claimant go through a cleaning procedure every week to help alleviate problems, but Claimant stated that she cannot afford it. (R. 50). The condition affects Claimant's ability to understand conversations taking place in her presence, which has affected her ability to work in the past. (R. 50-52.) Claimant has been told that her condition cannot be fixed and that hearing aids would not help her. (R. 51).

Claimant's health problems have caused her to become depressed. She becomes upset because she is not able to communicate with others as effectively as she used to–her asthma makes her voice difficult to hear and the aural polyps hinder her ability to hear others. (R. 54). Claimant's diabetes greatly affects her energy level and vision. (R. 55).

Claimant alleges a number of functional limitations as a result of her conditions. She estimated that she could drive for up to ten (10) minutes at a time. (R. 40). She can walk for about half a block without experiencing pain and can stand for about 30 minutes. (R. 40-41). Claimant can sit for approximately an hour at a time. (R. 41). She lives with her husband and seven-year-old son and can set out her son's clothes for him but is unable to bathe him herself. (R. 42). Claimant stated that whenever she engages in some modicum of activity, such as cleaning her bed or preparing a meal, she needs to sit down and rest afterward. (R. 43). Claimant states that her conditions prevent her from being active in the community. (R. 55).

## C.  Vocational Expert's Testimony at the Administrative Hearing

Maria Vargas testified as a VE at the administrative hearing. (R. 56-63). After the VE's testimony regarding Claimant's past work experience (R. 57), the ALJ asked the VE to assume a

7

hypothetical individual of the same age, education and prior work experience as Claimant and posed four (4) hypothetical questions. First, the ALJ asked whether the individual could perform Claimant's past relevant work assuming the individual has the physical capacity to perform light work with the further limitations that the individual

> could lift 20 pounds occasionally, 10 pounds frequently. This individual must avoid ladders, ropes, and scaffolds, but could occasionally perform all other postural activities. This individual could not perform work that required fine hearing, but conversational hearing is adequate, and it wouldn't involve frequent communicative skills, you know, verbal, oral, wouldn't involve frequent talking as part of the job. This individual must avoid a concentrated exposure to hazards, pulmonary irritants, and loud noises as part of the work environment, would be limited to simple, repetitive tasks, unskilled work, only occasional public contact, and the work could be routine with high output or quota work, so a limited range of light exertion.

(R. 57-58). The VE responded that such an individual could not perform Claimant's past relevant work. (R. 58). The ALJ then asked whether there was any other light work that the hypothetical individual could perform. *Id.* The VE responded in the affirmative and provided three (3) examples of jobs that exist in significant numbers in the regional and national economies: mail clerk (DOT # 209.687-026), small parts assembler (DOT # 706.684-022), and electronics worker (DOT # 726.687-010). (R. 58). The ALJ then added to the hypothetical by asking whether the need for a walking cane would affect the individual's ability to perform any of the cited jobs. (R. 58-59). The VE responded that the individual would no longer be able to perform the mail clerk job but that the other jobs would be unaffected. (R. 59). Next, the ALJ added a limitation to the original hypothetical that the individual could only stand for 30 minutes at a time before needing a two-minute break. *Id.* The VE responded that such a restriction would eliminate the mail clerk job but that the others would still be available with a sit/stand option. *Id.* Finally, the ALJ asked whether the individual would be competitive in the identified jobs if he or she needed to elevate the left leg during the work day. *Id.*

8

The VE responded that such a requirement would eliminate the availability of all of the identified jobs. *Id.*

Claimant's counsel then asked some questions of the VE. The VE testified that the restrictions identified by the ALJ would probably erode about 75% of available jobs at the light exertional level. (R. 60). Claimant then asked whether the individual would be able to maintain employment in the identified jobs if he or she was unable to stand for more than two (2) hours in an eight (8)-hour workday. (R. 60-61). The VE responded that such a restriction would prevent the individual from performing any of those jobs. (R. 61). The VE testified that in her general experience, unskilled jobs typically do not have sit/stand options available to employees and that the availability of such options generally depends upon the employer. *Id.* The VE stated that in many parts assembly jobs she had observed, most workers performed the work while standing but some had stools available to them so they could work while seated. *Id.* Last, the VE stated that any structuring of the workplace around an individual's hearing problems would be guided by advice from a physician. (R. 62-63).

# V. DISCUSSION

## A. RFC Assessment

Claimant contends first that the ALJ improperly assessed her RFC by finding that she was capable of performing light work. Pl.'s Mem. at 13-17. The court disagrees and finds that the ALJ's RFC assessment is supported by substantial evidence.

An individual's RFC is defined as the capacity which an individual possesses despite the limitations caused by his or her physical or mental impairments. 20 C.F.R. § 404.1545(a)(1); *see also* SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC assessment is based on all the

9

relevant medical and other evidence in the record and may include a claimant's own description of limitations arising from alleged symptoms. 20 C.F.R. § 404.1545(a)(3); *see also* SSR 96-8p, 1996 WL 374184, at \*5. When a claimant has a number of impairments, including those deemed not severe, the ALJ must consider their cumulative effect in making a disability determination. 42 U.S.C. § 423(d)(2)(B); *see Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) (citations omitted) ("[I]n determining whether an individual's impairments are of sufficient severity to prohibit basic work related activities, an ALJ must consider the combined effect of a claimant's impairments."). Sufficient consideration of the combined effects of a claimant's impairments is shown when each is separately discussed by the ALJ and the ALJ also discusses Claimant's complaints and activities. *See Newton v. Astrue*, 559 F. Supp. 2d 662, 676 (E.D.N.C. 2008); *Baldwin v. Barnhart*, 444 F. Supp. 2d 457, 465 (E.D.N.C. 2005) (citations omitted). The RFC assessment "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96-8p, 1996 WL 374184, at \*7.

In the present case, Claimant's principal argument is that the ALJ failed to consider functional limitations identified by two of her treating physicians when determining the RFC and other limitations on her exertion level. Claimant refers to the opinions of Dr. Josette Maria (R. 754-56), who treated Claimant beginning in August 2009, and Dr. Lakshman Rao (R. 753), whose clinic had seen Claimant since January 2005. The opinions were expressed in the form of letters written to the Commissioner. Claimant specifically contends that by ignoring these opinions, the ALJ also ignored significant limitations on Claimant's ability to maintain competitive employment in the jobs identified by the VE, such as degenerative disc disease in Claimant's back and neck, mild

10

retardation, degenerative joint disease and ligament tears, and the inability to stand and walk for extended periods of time. Had the ALJ accounted for these opinions, argues Claimant, the ALJ would not have been able to find that Claimant was fit to work at the light exertion levels. Thus, Claimant argues that the ALJ's decision regarding the RFC determination is not supported by substantial evidence.

Dr. Rao treated Claimant at the Dunn-Erwin Medical Center in Erwin, NC, where Claimant has been a patient since at least 2005. *See* (R. 478-79 (earliest records from Dunn-Erwin in the record)). Dr. Rao treated Claimant for a number of health problems, including asthma, chronic obstructive pulmonary disease ("COPD"), left leg pain, diabetes, back and neck pain, and other assorted and isolated medical problems. *See, e.g.*, Exhibit 20F (R. 613-32) (treatment records from Dunn-Erwin Medical Center from November 2010 to February 2012). Dr. Rao opined that Claimant is totally and permanently disabled and unable to work because of her diagnosed medical conditions: asthma, chronic back pain, diabetes, chronic sinusitis, hearing loss, hypertension, and cervicalgia. (R. 753). Dr. Rao noted the following functional limitations: problems communicating with others in a work setting; no bending, stooping, squatting, pushing, pulling, or walking for extended periods of time; avoiding exposure to hot and cold temperatures, strenuous activities, dust, smoke, or fumes; and avoiding more than minimal exertion. *Id.*

Dr. Maria treated Claimant at the Maria Medical Center in Dunn, North Carolina, beginning in January 2009. *See* (R. 410) (first report from Maria Medical Center in the record from January 29, 2009). Dr. Maria treated Claimant for a number of ailments, including back and leg pain, asthma, kidney disease, diabetes, and medication refills for her conditions. *See, e.g.*, Exhibit 22F (R. 694-745) (treatment records from Maria Medical Center from February 2011 until April 2012).

11

Dr. Maria noted that Claimant becomes short of breath when she exerts herself, lifts five (5) pounds or more, or walks short distances. (R. 754-56) (Dr. Maria initially opined that Claimant could lift up to ten (10) pounds before becoming short of breath in her first letter in June 2012, before revising the estimate to five (5) pounds in her second letter of October 2012). Dr. Rao stated that Claimant is a good candidate for full disability because of the different conditions which affect her ability to function and that Claimant is unable to stand, sit, or lift because of her chronic pain and shortness of breath. (R. 756).

In the decision, the ALJ found that Claimant had the RFC to perform light work, with some limitations. (R. 18). Specifically, the ALJ limited Claimant's activities that involve grabbing, such as climbing ropes and ladders, included provisions for her hearing impairment, limited Claimant's exposure to hazards, and provided that Claimant should be limited to simple and repetitive work. (*Id*). In developing this assessment, the ALJ considered Claimant's medical history and records in chronological order from January 2010, preceding Claimant's alleged onset date, until April 2012, the latest reports contained in the record. (R. 19-21). The ALJ also considered Claimant's problems with the meniscus tear in her knee (R. 21-22), mental health issues (R. 22), the opinions of several examining and consulting physicians (R. 22-24), and Claimant's testimony about her ailments and resulting functional limitations (R. 18; 24).

Since the ALJ expressly adopted many of the functional limitations identified by Drs. Rao and Maria into his RFC assessment, such as Claimant's hearing impairment, limited grabbing activities, limited exposure to hazards, and that Claimant should be limited to repetitive and routine tasks, the issue is whether the ALJ's decision not to include the additional restrictions identified by those sources is supported by substantial evidence. Thus, the limitations at issue are Claimant's

12

ability to lift up to ten (10) pounds frequently and 20 pounds occasionally, walk and stand for periods of time, tolerate exposure to hot and cold temperatures, or to engage in any sort of exertive activities. *See* (R. 753; 754-56); 20 C.F.R. § 404.1567(b) (defining light work, the exertion level the ALJ found Claimant capable of performing). As described below, the ALJ's decision not to include each of these limitations is supported by substantial evidence.

First, the ALJ's decision to allow for Claimant to lift up to 20 pounds occasionally and up to ten (10) pounds frequently is supported by substantial evidence. While Drs. Rao and Maria opined that Claimant's ability to lift was significantly impaired by her condition, Dr. Alan Cohen, a consultative examiner, prepared a written opinion, which the ALJ considered (R. 20; 22), that Claimant was only moderately limited in her ability to lift and mildly limited in her ability to carry. (R. 465). Despite noting that Claimant gave poor effort during his tests, Dr. Cohen observed some reduced range of motion in Claimant's spine, but also perfect muscle strength and a negative straight-leg raising test. (R. 464-67). Further, the state agency medical consultant's report[2], to which the ALJ assigned "some weight" (R. 23), found that Claimant could frequently lift ten (10) pounds and occasionally lift 20 pounds after a review of Claimant's medical history. (R. 93). Finally, Claimant admitted to being able to lift up to 25 pounds in August 2010, despite her conditions. (R. 200). These findings and admissions from the record constitute substantial evidence supporting the ALJ's determination that Claimant is able to lift 20 pounds on occasion.

Next, the ALJ did not limit the amount of time that Claimant could sit or stand at one time. Instead, the ALJ found that Claimant could perform light work, which requires "frequent" standing,

---

[2]As discussed below in subsection II, the ALJ's decision to assign more weight to the opinion of the state agency medical consultant than to those of Claimant's treating physicians is supported by substantial evidence.

meaning up to six (6) hours in an eight (8) hour workday. SSR 83-10, 1983 WL 31251, at \*5-6 (Jan. 1, 1983). Dr. Rao noted that Claimant should avoid walking for extended periods of time because Claimant would become short of breath (R. 753) while Dr. Maria stated that Claimant could not sit or stand for any length of time because of her chronic pain (R. 754-56). Again, the ALJ's decision not to include such a limitation is supported by substantial evidence. As noted by the ALJ, the treatment notes from both Dr. Rao and Dr. Maria during the period of August 2010 until April 2012, consistently describe a full range of motion, no antalgic gait, and no muscle weakness, outside of an isolated incident with Claimant's left knee in August 2011, after she was involved in a car accident. *See generally* Exhibit 12F (R. 425-62) (treatment notes from Maria Medical Center from May 2010 until January 2011); Exhibit 20F (R. 613-32) (treatment records for Dunn-Erwin Medical Center from August 2010 until February 2012); Exhibit 22F (R. 694-745) (treatment notes from Maria Medical Center from February 2011 until April 2012). *But see* (R. 453-55) (Claimant appears at appointment wearing a brace on her left knee); (R. 626-28) (August 2011 visit noting limited range of motion and tenderness in left knee). Further, Dr. Cohen noted in his consultative report from March 2011 that Claimant's gait and station were both normal, that claimant could sit, stand, and walk around without problems, and concluded that Claimant's ability to sit, stand, and travel was not impaired. (R. 464-65). These records constitute substantial evidence that Claimant's pain does not preclude her from meeting the standing requirements of light work.

Third, the ALJ did not provide any limitation to Claimant's exposure to hot and cold temperatures, which Claimant alleges cause her asthma to intensify. The ALJ found that Claimant's asthma attacks prompted by temperature changes were controlled by medication (R. 19-20) and that the treatment regimen of medication was generally conservative (R. 20). In August 2010, Claimant

14

reported to Dr. Maria complaining of asthma attacks in the heat and humidity, which Dr. Maria treated by refilling Claimant's asthma medications. (R. 448-50). During her next appointment with Dr. Maria, in early September 2010, Claimant did not complain of any weather-related asthma issues and Dr. Maria noted that Claimant's condition was stable. (R. 444-47). Further, in April 2011, Dr. Donald Rabil opined that the major reason that Claimant's asthma had been poorly controlled was that Claimant tended to overuse her medications early in the month, which led to relapses when she had exhausted her supply of medication. (R. 473). Claimant was reeducated on how to properly use her asthma medication so that her symptoms could be properly controlled throughout each month and so she would not have to rely on rescue inhalers when problems arose later in the month. (R. 473-74). In the visits to Dr. Maria following Claimant's visit with Dr. Rabil, Dr. Maria noted that Claimant's asthma was generally doing well except for high temperatures. *See* (R. 709-18) (records for Claimant's June 2011 and July 2011 visits to Maria Medical Center). After both appointments where temperature was noted as a problem, however, Claimant's medication remained unchanged, *id.*, which is consistent with the ALJ's findings that her condition was controlled adequately by medication and a conservative treatment regimen. The ALJ's finding that exposure to temperatures did not pose an additional non-exertional limitation on Claimant, therefore, is supported by substantial evidence.

Finally, the ALJ did not limit the amount of exertive activity to which Claimant could be exposed. Dr. Rao opined that "minimal exertion" can cause Claimant chest pains and shortness of breath, and Claimant therefore contends that this limitation should have been included. (R. 753). The ALJ's determination not to include such a limitation, however, is supported by substantial evidence. During Dr. Cohen's consultative evaluation in April 2011, Claimant was given a

15

pulmonary function assessment and was not found to be easily fatigued, short of breath during exertion, or short of breath at rest after having taken two (2) puffs of ProAir. (R. 466). She did not cough or wheeze during the test. *Id.* Dr. Cohen's prognosis was that Claimant's stamina was moderately impaired. (R. 465). During a Resting and Exercise Pulse Oximetry test conducted by Dr. Cohen the next day, Claimant exhibited normal characteristics after walking for six (6) minutes. (R. 477). In the treatment notes compiled by Drs. Rao and Maria after these test results, no problems with asthma and exertion are noted outside of an isolated incident in May 2011. *See* (R. 623-32 (Dr. Rao's treatment notes from May 2011 until February 2012); 699-745 (Dr. Maria's treatment notes from May 2011 until April 2012)). These test results and medical records constitute substantial evidence supporting the ALJ's decision not to include a limit on exertion in his RFC determination.

Since the ALJ's decision not to include the additional limitations identified by Drs. Rao and Maria is supported by substantial evidence, the ALJ committed no reversible error in making his RFC determination.

## B. Weight Accorded to Treating Physicians' Opinions

Claimant next contends that the ALJ failed to properly assess the opinions of two of Claimant's treating physicians, Drs. Rao and Maria, in assigning them little weight. Pl.'s Mem. at 17-21. The court disagrees and finds that the ALJ properly assessed each opinion.

Regardless of the source, the ALJ must evaluate every medical opinion received. 20 C.F.R. § 404.1527(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 404.1527(c)(1). Additionally, more weight is generally given to opinions of treating sources, who usually are most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability, than non-treating sources, such as

16

consultative examiners. *Id.* § 404.1527(c)(2). Though the opinion of a treating physician is generally entitled to "great weight," the ALJ is not required to give it "controlling weight." *Craig*, 76 F.3d at 590. In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight. *Id.*; *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (stating "[t]he ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence"); *Mastro*, 270 F.3d at 178 (explaining "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence") (citation omitted).

If the ALJ determines that a treating physician's opinion should not be considered controlling, the ALJ must then analyze and weigh all the medical opinions of record, taking into account the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist.[3] *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). While an ALJ is under no obligation to accept any medical opinion, *see Wireman v. Barnhart*, No. 2:05-CV-46, 2006 WL 2565245, at \*8 (W.D. Va. Sept. 5, 2006), she must nevertheless explain the weight accorded such opinions. *See* SSR 96-2p, 1996 WL 374188, at \*5 (July 2, 1996); SSR 96-6p, 1996 WL 374180, at \*1 (July 2, 1996). Moreover, when considering the findings of state agency consultants, the ALJ must

> evaluate the findings using relevant factors . . . , such as the [consultant's] medical specialty and expertise in [the Social Security Administration's] rules, the supporting

---

[3] The Social Security regulations provide that all medical opinions, including opinions of examining and non-examining sources, will be evaluated considering these same factors. 20 C.F.R. § 404.1527(e).

evidence in the case record, supporting explanations provided by the [consultant], and any other factors relevant to the weighing of the opinions.

20 C.F.R. § 404.1527(f)(2)(ii). The ALJ must explain the weight given to these opinions in her decision. *Id.*; SSR 96-6p, 1996 WL 374180, at *1. Here, the ALJ followed the proper procedures for evaluating the medical opinions in the case.

First, the ALJ evaluated the opinion of Dr. Sandhu, the state agency medical consultant. (R. 23). Dr. Sandhu opined that Claimant could lift up to 20 pounds occasionally and up to ten (10) pounds frequently, could stand for up to six (6) hours in an eight (8) hour workday, and that Claimant should limit exposure to hazards, such as machinery, and pulmonary irritants, such as fumes and gases. (R. 93-95). The ALJ noted that Dr. Sandhu neither treated nor examined Claimant and instead evaluated the opinion in light of the test results and treatment notes contained throughout the record. (R. 23). For example, the ALJ considered that both Dr. Rao and Dr. Maria consistently reported full muscle strength and no gait disturbance in Claimant from August 2010 until April 2012. (R. 23; 425-62; 613-32; 694-745). The ALJ also noted that Claimant stated that she could lift up to 25 pounds. (R. 23; 200). Finally, the ALJ found that Claimant's condition warranted protection from pulmonary irritants. (R. 23). Where the opinions of the state agency medical consultants are consistent with the other evidence of record, as is the case here, the ALJ is entitled to rely upon the opinions in determining the Claimant's RFC. *Smith v. Schweiker*, 795 F.2d 343, 356 (4th Cir. 1986).

Next, the ALJ properly explained his decision to assign "little weight" to the opinions of Claimant's treating physicians. (R. 23-24). While not completely addressing the length and nature of the relationship that each treating physician had with Claimant, the ALJ clearly considered that each physician had an extensive treatment history with Claimant by thoroughly reviewing each

18

doctor's treatment records. For example, the ALJ considered Dr. Maria's treatment history as a follow-up care provider for symptoms related to Claimant's asthma between May 2010 and January 2011 (R. 19-20) and from June 2011 until April 2012 (R. 20-21). The ALJ also considered Dr. Rao's treatment notes from February 2011 (R. 20) and from May 2011 until February 2012 (R. 20-21). Such consideration of treatment notes shows that the ALJ was aware of the nature and extent of the treatment relationship that each doctor had with Claimant. *See Paschall v. Astrue*, No. 5:10-CV-161-FL, 2011 WL 1750757, at *4 (E.D.N.C. May 6, 2011) (finding that the ALJ's discussion of treatment notes spanning several years evinced knowledge and consideration of the nature and extent of the treatment relationship).

The ALJ also thoroughly examined the supportability and consistency factors. As noted above, the ALJ extensively considered the treatment notes of both Dr. Rao and Dr. Maria in assessing Claimant's RFC. The ALJ found that some of the limitations identified by Claimant's treating physicians were supported by the record while others were not. (R. 19-24). The ALJ also found parts of each opinion to be inconsistent with the evidence of record and each doctor's treatment regimen and history. For example, the ALJ noted that the physicians' treatment notes consistently found Claimant to have full muscle strength, normal gait, and normal range of motion and that such findings were inconsistent with the restrictions each doctor placed upon Claimant. (R. 23-24). The ALJ also noted how the routine and conservative treatment regimen the doctors recommended for Claimant, which generally kept Claimant on medication rather than more serious forms of treatment, was inconsistent with limitations the doctors placed upon her. (R. 20; 24). Despite not explicitly mentioning the factors, the ALJ here properly considered each opinion and gave reasons, supported by substantial evidence, to defend his decision to accord the opinions little

19

weight. *See Warren v. Astrue*, No. 5:08-CV-149-FL, 2009 WL 1392898, at \*3 (E.D.N.C. May 18, 2009) (holding that an ALJ does not have to "expressly set forth a factor-by-factor analysis of each of the considerations listed" as long as the opinion shows all relevant considerations).

Finally, the ALJ disregarded each doctor's opinion that Claimant was completely disabled and unable to complete tasks necessary for gainful employment. (R. 23-24; 753; 754-56). These opinions fall under the auspices of 20 C.F.R. § 404.1527(d), which reserves opinions on certain issues for the Commissioner. Among those is the opinion that the Claimant is disabled, 20 C.F.R. § 404.1527(d)(1), and opinions regarding Claimant's ability to work, 20 C.F.R. § 404.1527(d)(2). While these opinions may not be summarily dismissed on that basis, the ALJ does not have to assign them any "heightened evidentiary value." *Morgan v. Barnhart*, 142 F. App'x 716, 723 (4th Cir. 2005). Rather, the ALJ must assess the opinions in light of the record to "determine the extent to which the [treating physician's legal conclusion] is supported by the record." *Id.* (citing SSR 96-5p, 1996 WL 374183, at \*3 (July 2, 1996)). Here, the ALJ performed the requisite review of the record and found that opinions that Claimant was disabled and unable to work were not supported by the record as a whole in assigning the opinions "minimal weight." (R. 23-24). To support this conclusion, the ALJ mentioned that the opinions were at odds with each doctor's treatment notes and that Claimant's conditions were only aggravated when she failed to use her medicine properly. (R. 24). As noted above, these findings are supported by substantial evidence. Therefore, the ALJ's dismissal of each doctor's opinion on Claimant's disability status and ability to work was proper in this case.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment

on the Pleadings [DE-18] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE-21] be GRANTED, and the final decision of the Commissioner be UPHELD.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days upon receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

SO SUBMITTED, this the 14th day of July 2014.

Robert B. Jones, Jr.
United States Magistrate Judge